IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| TROY CARICO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:19-CV-756-WKW |
| | ) | [WO] |
| UPS GROUND FREIGHT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Troy Carico enjoys smoking cigars, and he occasionally kindled a stogy at his former workplace.  It was not the cigars that stubbed out his employment with Defendant UPS Ground Freight, Inc.; it was the lighter he used to ignite them.  Mr. Carico received a unique gift during the days of his military service—a lighter that is a replica of a .380 Walther PPK semi-automatic pistol. The lighter came complete with a holster, which Mr. Carico sometimes donned on his hip at work.  Defendant has a policy that "prohibit[s] the possession and/or use of weapons by any employee on UPS property."  (Doc. # 41-1, at 101.) Defendant mistook the lighter for a firearm and terminated Mr. Carico's employment.  This action is about Mr. Carico's termination.

Mr. Carico has sued Defendant, denying that he carried a firearm at work and alleging that the real reasons for his termination are discriminatory based on

his race, disabilities, and military veteran status, as well as retaliatory, in violation of (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); (2) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a) ("ADA"); and (3) the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 4311 ("USERRA").  He also brings two claims under Alabama law for breach of contract and intentional infliction of emotional distress.

Before the court is Defendant's motion for summary judgment (Doc. # 40), which is fully briefed (Doc. # 42–43).  After careful consideration of the arguments of counsel, the applicable law, and the facts, the court finds that the motion for summary judgment is due to be granted in part and denied in part.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), and 28 U.S.C. § 1367 (supplemental jurisdiction).  Personal jurisdiction and venue are not contested.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn from it, in the light most favorable

to the nonmoving party. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id*. Or a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials . . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

3

## III.  BACKGROUND

### A.   Mr. Carico's Military Background and Hiring at UPS Freight

Mr. Carico enlisted in the Army National Guard in 1988.  He was commissioned a second lieutenant in 1990 "as an early commissioning program recipient."  (Doc. # 42-1, at 20 (Pl. Dep.).)[1]  Mr. Carico served from 1988 to 2009 in both active and reserve statuses.  (Doc. # 42-9, ¶¶ 2–3 (Pl. Decl.); Doc. # 42-1, at 20, 30.)

Mr. Carico is a disabled veteran, with disability ratings ranging from 90% to 100%.  (Doc. # 42-9, ¶ 8.)  As a result of his military service, Mr. Carico suffers from bilateral hearing loss, tinnitus, degenerative bone disease in his feet and ankles, and post-traumatic stress disorder ("PTSD").  (Doc. # 42-9, ¶ 9 (Pl. Decl).)  Mr. Carico receives disability compensation from the Department of Veterans Affairs ("VA").  He has weekly appointments with the VA in order to treat his conditions and maintain his benefits.  (Doc. # 42-1, at 196, 229); Doc. # 42-2, at 227 (email).)

Defendant UPS Ground Freight, Inc. ("Defendant" or "UPS Freight") hired Mr. Carico through a veterans' employment initiative program to work at its Montgomery, Alabama facility.[2]  (Doc. # 42-1, at 136–37, 146–47 (Pl. Dep.).)  Mr.

---

[1] Citations in this opinion are to the CM/ECF document and page numbers in the header.

[2] Mr. Carico identifies the program as both "Next level Leaders Now" (Doc. # 42-1, at 146) and the "veterans reemployment education program" (Doc. # 42-1, at 34).

Carico began his employment with Defendant in September 2015, as a manager in training and earned a promotion in April 2016 to the terminal manager.  The terminal manager is the highest-level managerial position onsite at the Montgomery facility.[3] As terminal manager, Mr. Carico directly supervised more than fifteen drivers and warehouse workers.  (Doc. # 42-9, ¶¶ 11, 13, 14, 16 (Pl. Decl.); Doc. # 41-3, ¶ 3 (Campbell Decl.).)

## B.   UPS   Freight's   Policies   on   Weapons,   Absenteeism,   ADA   Accommodations, and Anti-Harassment

Defendant's Employee Reference Guide contains standards of conduct and policies for UPS Freight employees.  The following policies are relevant to Mr. Carico's claims.

### 1.   *Workplace Violence Prevention Policy*

Defendant has a written "Workplace Violence Prevention Policy," which is "a policy of zero tolerance with respect to violence in the workplace."  As part of that policy, Defendant "prohibit[s] the possession and/or use of weapons by any employee on UPS property."  (Doc. # 41-1, at 101 (Employee Reference Guide).) This policy applies to all employees.

---

[3] This position also is referred to as "operations lead supervisor."  (Doc. # 42-2, at 182.)

The policy obligates employees to report any violent or threatening conduct at the workplace to either a direct supervisor, a human resources manager, an occupational health manager, a security manager, or an 800 help line.  (Doc. # 41-1, at 101.)  The policy provides:

> Employee information will be treated as important and appropriate action, including an investigation will be taken.  If an investigation reveals that this policy has been violated, such conduct will be dealt with appropriately.  This may include disciplinary action up to and including termination of employment of person(s) in violation of this policy.  Individuals violating laws also may be subject to criminal prosecution.

(Doc. # 41-1, at 101.)  The policy does not define "weapons," but the parties do not dispute that firearms and knives are prohibited weapons under the policy.

At all times, Mr. Carico was well-versed on the Workplace Violence Prevention Policy.  He understood the importance of the policy and that possession of a weapon on UPS Freight property could result in termination.  (Doc. # 42-1, at 234–36 (Pl. Dep.).)  Armed with that knowledge, Mr. Carico "never carried a firearm on the Defendant's premises during his employment there."  (Doc. # 42-9, ¶ 103 (Pl. Decl.).)

### 2.    *Attendance and Sick Leave Policies*

Management employees do not accrue sick leave.  Under Defendant's attendance policy, employees who are out sick more than three days must apply for short-term disability or for leave under the Family Medical Leave Act ("FMLA").

(Doc. # 42-3, at 33 (Curzi Dep.).)   Short-term disability and FMLA leave "run congruent[ly]."   (Doc. # 42-3, at 31; *see also* Doc. # 42-3, at 33–34, in which Gina Curzi, a human resources manager, explains the FMLA policies).)   Defendant's employees can use FMLA's twelve-week leave allowance "intermittently or on a reduced schedule under some circumstances."   (Doc. # 41-1, at 94 (Employee Reference Guide).)

### 3.   *Requests for ADA Accommodations*

Defendant's Employee Reference Guide contains a section titled, "Accommodations under the Americans with Disabilities Act," which provides:

> When an individual requests an accommodation to perform his or her job, UPS will review the request and determine whether a reasonable accommodation is appropriate.   This review occurs in an individualized, case-by-case manner.   If you believe that a job modification or other form of accommodation is needed under this policy, you should immediately consult with your Human Resources representative.

(Doc. # 41-1, at 98–99.)   Additionally, according to Ms. Curzi, a human resources manager, when an employee requests an accommodation under the ADA, he or she is provided a packet to assist the employee in submitting a request for an accommodation.   (Doc. # 42-3, at 15–16 (Curzi Dep.).)

### 4.   *Anti-Harassment Policy*

Defendant prohibits harassment in all forms, including on the basis of race or a disability.   "Any employee who . . . believe[s] that he or she is subject to or may

7

be subjected to objectionable conduct must report it immediately to a supervisor or manager, a Human Resources representative," or an 800 help line.  (Doc. # 41-1, at 97 (Employee Reference Guide).)  "In response to such reports, UPS will conduct a prompt and thorough investigation," will "[t]o the extent possible" keep the investigation confidential, and "will take immediate and appropriate corrective action whenever it determines that harassment has occurred."  (Doc. # 41-1, at 97.)

According to Ms. Curzi, when an employee makes a complaint about workplace harassment, the investigation commences with the taking of a written statement from the complaining employee, which is kept confidential where possible, and ends with the completion of a written report.  (Doc. # 42-3, at 112 (Curzi Dep.) ("Anytime" an employee raises a concern, "we would ask for a written statement from . . . the employee outlining what type of harassment, specifics, so that we could investigate."); Doc. # 42-3, at 40–41, 44 (Curzi Dep.) (discussing investigative reports); *see also* Doc. # 41-9, ¶¶ 55–56 (Pl. Decl. (citing Curzi Dep.).)

## C.   **Mr. Carico's Supervisors**

Mr. Carico worked under the supervision of the regional director of operations ("RDO"), who oversaw fourteen UPS Freight facilities across the Southeast.  (Doc. # 41-3, ¶¶ 2–3 (Campbell Decl.).)  When Mr. Carico was hired, Don Culmer was the RDO; however, in October 2016, Danny Campbell took over the position.  (Doc. # 42-9, ¶¶ 14, 20 (Pl. Decl.); Doc. # 41-3, ¶ 2; Doc. # 42-2, 14–15 (Campbell Dep.);

Doc. # 42-3, at 23 (Curzi Dep.).)  Mr. Campbell's managerial style differed from Mr. Culmer's, and under Mr. Campbell's supervision, matters for Mr. Carico took a bad turn.  (*See* Doc. # 42-1, at 354 (Pl. Dep.), in which Mr. Carico notes a "noticeable change of culture" in management's attitude toward his VA appointments when Mr. Campbell took the job as RDO; *see also* Doc. # 42-1, at 361.)  Mr. Campbell is African American, and Mr. Carico is white.  (Doc. # 42-9, ¶ 21.)

Mr. Campbell and Mr. Carico's professional relationship started out on the wrong foot.  Mr. Campbell held "standing" conference calls with calendar invitations.  Those calls included safety meetings with the operations lead supervisors and terminal managers.  Mr. Campbell expected advance notice if a supervisor or manager would be unable to attend.  (Doc. # 41-3, ¶ 4 (Campbell Decl.); Doc. # 42-2, at 51 (Campbell Dep.).)  Mr. Carico does not dispute that he missed some calls without providing advance notice to Mr. Campbell.  But he says he did not always receive the calendar invitations for the meetings due to a software glitch.  (Doc. # 42-9, ¶ 28  (Pl. Decl); Doc. # 42-1, at 352, 326–27 (Pl. Dep.); Doc. # 42-2, at 49.)  Mr. Carico says that, as for his medical appointments, he "populate[d] [his] Microsoft planner as best [he] could to let [Mr. Campbell] know of the advance dates," but that Mr. Campbell "didn't read anything" he sent to him.  (Doc. # 42-1, at 196; *see also* Doc. # 42-1, at 229 (testifying that he "always" told Mr. Campbell when he had a medical appointment but that some appointments, particularly those

with psychiatrists, occurred unexpectedly when there was a cancellation, and that Mr. Campbell "had a problem, it seemed" with those last-minute appointments).)

Mr. Carico recounts two incidents when he contends that Mr. Campbell degraded him for being absent at work to attend medical appointments for his service-connected disabilities.  One incident was in May 2017, and the other was in December 2017.

### D.   The May 2017 Incident

In the evening of May 1, 2017, Mr. Carico sent Mr. Campbell an email that he would not be able to ride with a driver to the Atlanta hub that evening because he had a VA medical appointment the next day.[4]  (Doc. # 42-3, at 143 (May 1, 2017 email); Doc. # 42-1, at 330–31 (Pl. Dep.).)  Mr. Campbell responded by leaving Mr. Carico a voicemail message, which Mr. Carico perceived as "aggressive" and "confrontational."[5]  (Doc. # 42-1, at 326 (Pl. Dep.); *see also* Doc. # 42-1, at 334–35.)  Mr. Campbell also responded by email as follows:  "Troy, This wasn't

---

[4] As Mr. Carico explained, "each manager was expected one night out of the week . . . to ride with one of their drivers . . . to both of the hubs," *i.e.*, Atlanta and Birmingham, and Mr. Campbell sent out an "e-mail call for drivers to go with their line haul drivers" and requested all the managers to go to Atlanta on that particular evening.  (Doc. # 42-1, at 330–31, 333 (Pl. Dep.).)  Mr. Carico did not understand, though, why Mr. Campbell labeled the trip as a "serious process implementation" for which Mr. Carico's support on that date was needed.  (Doc. # 42-1, at 331.)  As Mr. Carico put it, "other managers rode on other nights" so "[w]hat's the problem with me doing it [a different] night if I have an appointment?"  (Doc. # 42-1, at 332; *see also* Doc. # 42-2, at 40–41.)

[5] There is not a recording of the voicemail in evidence.

10

communicated earlier when the communication came out[.]  This is a serious process implementation that your support is needed on.  What hours did you work <u>in the facility</u> today?"  (Doc # 42-3, at 142 (emphasis in original).)

Mr. Carico replied to Mr. Campbell that he was overextended at work, which had his "PTSD torqued out," and that Mr. Campbell's "tenor of questioning" about the hours he worked at the facility was "insensitive to [his] medical status as a disabled veteran."  (Doc. # 42-2, at 222 (email).)  Answering, Mr. Campbell agreed with Mr. Carico that his "health [was] of the upmost importance and trump[ed] this one evening" (referring to the Atlanta trip), but he indicated that, because he was unaware that Mr. Carico was not making the trip, he did not relay Mr. Carico's absence to his superiors.  (Doc. # 42-3, at 141 (email) ("Again it's a matter of communication and the timeliness of it.  I was asked by my superiors last week, who wouldn't be working the outbound sort to include the reason and if there were any issues with any managers attending the ATL 3 a.m. initiative and roll out this week. I communicated those exceptions and was not aware that you wouldn't be attending nor that you wouldn't be on the outbound tonight.").)

On May 2, 2017, Mr. Campbell forwarded the foregoing email series to Ms. Curzi and discussed with her Mr. Carico's recurring VA medical appointments. (Doc. # 42-2, at 220–21 (email).)  Ms. Curzi then forwarded the email to her supervisor, Kimara Brown, prefacing that it "[s]eems Troy has VA appointments

11

every time something is needed" and that she had "spoke[n] to [Mr. Campbell] about Troy needing an ADA accommodation."  (Doc. # 42-2, at 220.)  According to the email chain between Ms. Curzi and Ms. Brown, Ms. Brown indicated that she agreed with Ms. Curzi's assessment and replied, "Yes agree to ADA."  (Doc. # 42-3, at 140; Doc. # 42-9, ¶ 34 (Pl. Decl).)  The emails do not specify the nature of the ADA accommodation.  Notwithstanding Ms. Brown's directive—"agree to ADA"—Mr. Carico received no communications from Ms. Curzi or Ms. Brown.  (Doc. # 42-1, at 341–42, 347–48 (Pl. Dep.); Doc. # 42-3, at 34 (Curzi Dep.).)  Hence, Mr. Carico reinitiated contact with Ms. Curzi.  Those communications are discussed in Part III.F.

## E.   The December 2017 Incident

Mr. Carico testified that there was a "very bad, bad moment" between Mr. Campbell and him in December 2017.  (Doc. # 42-1, at 179 (Pl. Dep.).)  On December 13, 2017, Mr. Carico was not on a scheduled conference call.  Mr. Campbell emailed Mr. Carico at the beginning of the meeting, "Are you on the safety call?"  (Doc. # 42-2, at 228.)  Three hours later, Mr. Carico emailed:  "What one?  I did not get an invite for anything. . . .  I am at the VA Traumatic Brain Center for my annual physical and MRI this AM and will be back at the terminal around 1045."  (Doc. # 42-2, at 228 (email); *see also* Doc. # 41-3, ¶ 5 (Campbell Decl.).)

12

Mr. Campbell then contacted Ms. Curzi to report Mr. Carico's pattern of missing meetings due to medical appointments.  (Doc. # 41-3, ¶ 6.)  Ms. Curzi recommended that Mr. Carico apply for intermittent leave under the FMLA to cover his medical appointments.  (Doc. # 41-3, ¶ 6.)  Mr. Campbell then emailed Mr. Carico and copied Ms. Curzi:

> We can discuss this in depth later today but with the reoccurring [sic] appointments you have at the VA, I recommend you apply for intermittent Family Medical Leave for your own personal reasons.
>
> This is the federal formalized process/law that's in place for all employees[,] and in the event you have additional questions[,] we have a large support group of individuals that can assist you through the process.

(Doc. # 42-2, at 227 (email); Doc. # 41-3, ¶ 6.)  Mr. Carico replied that, "as a 100% disabled veteran," he had "on average 1.5 appts per week," which were "mandatory" for him to retain his VA benefits.  (Doc. # 42-2, at 227 (email).)  He continued: "[Y]our suggestion" concerning the availability of FMLA leave "is neither tendered to me in a genuine concern nor is it sensitive to my disabilities . . .[.]  This is not the first time you have handled my medical and physical disabilities in a cavalier manner."  (Doc. # 42-2, at 227.)  Mr. Carico did not apply for FMLA leave.  (Doc. # 42-1, at 355 (Pl. Dep.); Doc. # 41-9, ¶ 60 (Pl. Decl.).)

**F.**      **Mr. Carico's Requests for Workplace Accommodations**

Mr. Carico contends that after the May 2017 and December 2017 incidents, he contacted Ms. Curzi to ask for a workplace accommodation for his PTSD.  Both requests stem from Mr. Campbell's treatment of him.

As to his first request, after the May 2017 email chain with Mr. Campbell concerning his absence from the Atlanta trip, Mr. Carico called Ms. Curzi.  He informed Ms. Curzi that he had PTSD and that he "need[ed] a better form of communication" with Mr. Campbell because Mr. Campbell was "insensitive" to his medical conditions.  (Doc. # 42-1, at 341–43 (Pl. Dep.).)  She responded that she took his complaint "very seriously" and that she would "elevate it" and "find out what's going on."  (Doc. # 42-1, at 343, 356.)

However, after three weeks passed without his having heard back from Ms. Curzi, Mr. Carico called her again.  Ms. Curzi told Mr. Carico the following:  Ms. Brown counseled Mr. Campbell and "told him to stand down and not to harass you about your appointments."  (Doc. # 42-1, at 342, 347 (Pl. Dep.).)

Again after the December 2017 incident, Mr. Carico contacted Ms. Curzi by email on January 8, 2018.  In his email, Mr. Carico reported that Mr. Campbell was continuing to harass him about his medical disabilities and that the harassment was

exacerbating his PTSD.[6]  (Doc. # 42-3, at 146 (Jan. 8, 2018 email); Doc. # 41-9, ¶ 53 (Pl. Decl.); Doc. # 42-1, at 175–77 (Pl. Dep.).)   Mr. Carico requested that Mr. Campbell "be educated on how to properly discuss matters with [him] regarding [his] medical disabilities" and "protected status."  (Doc. # 42-3, at 146.)  The next day, Ms. Curzi informed Mr. Carico by email that he could apply through Aetna for FMLA leave—which he could use intermittently to ensure that he had sufficient time to attend medical appointments.  She indicated that Ms. Brown was "waiting for [him] to contact her."  (Doc. # 42-3, at 145.)

Mr. Carico did not follow Ms. Curzi's recommendation, or Mr. Campbell's earlier recommendation, that he apply for FMLA leave because enrolling in FMLA would have required him to use his vacation time to cover his medical appointments. (Doc. # 42-1, at 355 (Pl. Dep.); Doc. # 41-9, ¶ 60 (Pl. Decl.).)  Mr. Carico contends that "a warranted reasonable accommodation" would have been "a modification in the communication from Mr. Campbell," including training for Mr. Campbell "on effective communication strategies with people with PTSD."  (Doc. # 41-9, ¶¶ 61, 62; Doc. # 42-1, at 366–69 (Pl. Dep.).)

As to Ms. Curzi's investigation into Mr. Carico's oral complaint in May 2017 and his emailed complaint in January 2018 against Mr. Campbell, Ms. Curzi did not

---

[6] The email indicates that Mr. Carico also talked to Ms. Curzi "during the holidays" about his "situation with Danny" Campbell, but that he had not yet heard back from her.  (Doc. # 42-3, at 146.)

obtain a written statement from him, notwithstanding her testimony that an investigation into a complaint about workplace discrimination commences with the taking of a written statement from the complaining employee. (Doc. # 41-9, ¶¶ 55–56 (Pl. Decl.); Doc. # 42-3, at 112 (Curzi Dep.).) Nor was Mr. Carico given a packet for requesting a workplace accommodation. (Doc. # 42-3, at 15–16; Doc. # 41-9, ¶ 57.) Furthermore, Ms. Curzi does not remember if she conducted an investigation into Mr. Carico's allegations against Mr. Campbell that he raised in his January 2018 email. She "look[ed] in [her] archives and . . . did not find" a report documenting her investigation. (Doc. # 42-3, at 41.)

## G.   Mr. Carico's Additional Complaints Concerning Mr. Campbell's Treatment of Him

Mr. Carico has additional grievances about Mr. Campbell's treatment of him. The following are illustrative.

First, at some point in 2017,[7] Mr. Campbell left a voicemail for Mr. Carico. In that voicemail, Mr. Campbell relayed to Mr. Carico "words to the effect" that his "VA appointments were getting in the way of developing his people and managing his payroll hours effectively" and that his medical conditions "were preventing him from fulfilling his duties." (Doc. # 42-9, ¶¶ 39–40 (Pl. Decl.); Doc. # 42-1, at 209–

---

[7] The exact date of some of the episodes is unclear from the record.

11 (Pl. Dep.).)  Mr. Carico testified that this voicemail was representative of Mr. Campbell's "common practice for awhile of [his] leaving very terse . . . voicemails." (Doc. # 42-1, at 215.)  Mr. Campbell also sent Mr. Carico "multiple text messages" that started with a "question about [his] availability" due to his "VA appointments." (Doc. # 42-1, at 228.)

Second, during the first week of December 2017, Mr. Campbell approached Clifford Godwin, another driver under Mr. Carico's supervision, and asked him questions, including "[W]hy is Troy always out for VA appointments or services?"; "Don't you think he is gone too much to be an effective leader and manager?"; and "What exactly is his problem and mental state of disarray that requires him to be attending so m[any] medical appointments?"  (Doc. # 42-8, ¶ 5 (Godwin Decl.).)

Third, in early 2018, during a disaster-planning conference call with more than fourteen terminal managers, Mr. Carico talked loudly over Mr. Campbell's supervisors.  (Doc. # 41-3, ¶ 8 (Campbell Decl.).)  After the conference call, Mr. Campbell called Mr. Carico and "took [him] to task" for interrupting and asked, "What is wrong with you?", but backed down when Mr. Carico reminded him that he had bilateral hearing loss.[8]  (Doc. # 42-1, at 190, 193–97 (Pl. Dep.).)  This

---

[8] Mr. Carico does not remember if this was the first time that he informed Mr. Campbell about his hearing loss, but he "think[s] [Mr. Campbell] knew about" his hearing loss.  (Doc. # 42-1, at 194, 196 (Pl. Dep.).)

conversation also "included talk of [Mr. Carico's] need to take time off for medical issues."  (Doc. # 41-9, ¶ 50 (Pl. Decl.).)

Fourth, sometime after the conference call in early 2018 (*see* Doc. # 42-1, at 351–52 (Pl. Dep.)), Mr. Campbell called Mr. Carico's brother, who also was a UPS Freight employee, and said, "What's wrong with your brother?"  (Doc. # 42-4, at 15 (Chad Carico Dep.); Doc. # 42-9, ¶ 42 (Pl. Decl.).)  Chad Carico informed Mr. Campbell that his brother "has PTSD" and other military-related "personal issues" and that he "doesn't act like most normal folks do."  (Doc. # 42-4, at 15.)

Fifth, around April 2018, Mr. Campbell asked Patrick Harris, a driver who worked under Mr. Carico's supervision, questions "along the lines of . . . why does [Mr. Carico] take so much time off?  What is wrong with him?"  (Doc. # 42-5, at 18, 36–37 (Harris Dep.).)  Mr. Harris responded, in sum and substance, that he did not know Mr. Carico's whereabouts when Mr. Carico was not at the facility.  (Doc. # 42-5, at 37.)

## H.   **Mr. Carico's Cigar Lighter**

Mr. Carico has a metal cigar lighter that is "a very lifelike replica of a Walther PPK."  (Doc. # 42-1, at 383–84 (Pl. Dep.).)  It was given to him in 2003 by a friend with whom he served in Iraq.  (Doc. # 42-1, at 115, 386.)  In Mr. Carico's words, "It could be mistaken as a gun."  (Doc. # 42-1, at 384; *see also* Doc. # 42-1, at 389 ("[I]t could look like a gun to the untrained eye.").)  He "didn't wear it all the time" while

at the UPS Freight facility, but he "sometimes would carry it," probably "several times a week," and "nobody said anything." (Doc. # 42-1, at 384, 387.) The lighter also came with a leather holster, and Mr. Carico typically carried it in the holster on his right hip. (Doc. # 42-1, at 388–89, 413.) As for function, "it is a professional grade torch lighter for any cigar." (Doc. # 42-1, at 385.)

Mr. Carico would take impromptu smoke breaks, and sometimes employees would join him. Two drivers—Solomon Williams and Patrick Harris—testified that they knew Mr. Carico had a replica pistol that was a cigar lighter and that they saw Mr. Carico wear it on his person at work. (Doc. # 42-6, at 14–16 (Solomon Williams Dep.); Doc. # 42-5, at 22 (Harris Dep.).) A third driver, Clifford Godwin, also knew that Mr. Carico had "a rather interesting torch lighter that he use[d] for lighting cigars in his office" and that he "sometimes carrie[d] it on his person." (Doc. # 42-8, ¶ 6 (Godwin Decl.).)

## I.     First Complaint Against Mr. Carico for Allegedly Carrying a Firearm on UPS Freight Property

In May 2018, a UPS employee who worked at Mr. Carico's terminal (but who was not under Mr. Carico's supervision) was fired for reasons unrelated to this lawsuit. When escorted out of the terminal, the terminated employee reported to a security supervisor (Joe Geibler) that Mr. Carico carried a firearm at work. (Doc. # 41-2, ¶ 5 (Duane Williams Decl.) & Ex. B; Doc. # 42-2, at 231 (email); Doc. # 42-

9, ¶ 66 (Pl. Decl.); Doc. # 42-1, at 319 (Pl. Dep.).)  In response, on May 30, 2018, a security manager (Barry Dean) and his supervisor (Kim Whetstone) met with Mr. Carico in his office to investigate the report.  (Doc. # 42-2, at 230 (Dean's report).)

When questioned, Mr. Carico denied the accusation, responding that he never had carried a firearm on Defendant's property and that, if he had one with him, he kept it in his locked vehicle.  (Doc. # 42-1, at 381 (Pl. Dep.); *see also* Doc. # 42-2, at 230 (Mr. Dean's report that Mr. Carico said that "he did [have a firearm] and he had license" but that he kept the firearm "locked in his car and d[id] not bring it into the facility").)  A hand-wand metal detector did not detect a weapon on Mr. Carico's person.  (Doc. # 42-2, at 230; Doc. # 42-9, ¶ 71 (Pl. Decl.).)

Mr. Carico confirmed that he was aware of Defendant's "No Weapons Policy."  (Doc. # 42-2, at 230; *see also* Doc. # 42-1, at 382 (Pl. Dep.).)  Mr. Dean surmised that the terminated employee was "disgruntled" and had made a false accusation against Mr. Carico.  Mr. Dean ended the interview with, "Sorry we wasted your time."  (Doc. # 42-1, at 372.)  Mr. Carico was not disciplined as a result of this unsubstantiated accusation.

At his deposition, Mr. Carico testified that he told these investigators that he "d[id] not have a gun," but that he had a lighter.  He then "pointed over to the cigar thing."  (Doc. # 42-1, at 374 (Pl. Dep.); *see also* Doc. # 42-1, at 319; Doc. # 42-9 ¶ 68 (Pl. Decl.) ("When Plaintiff was questioned by investigators regarding the

20

accusation of carrying a gun, he told them he had a lighter." (citing Pl. Dep.)).)   Mr.

Carico said, though, that Mr. Dean and Mr. Whetstone did not seem "real interested"

in his lighter that replicated a pistol.  (Doc. # 42-1, at 374.)  There is no mention of

this cigar lighter in Mr. Dean's initial report (Doc. # 42-2, at 230) or in his follow-

up report (Doc. # 42-2, at 229).  But Mr. Carico recalls that at some point he saw a

UPS Freight report that documented his having informed the investigators that he

sometimes carried a "cigar lighter that resemble[d] a gun."  (Doc. # 42-1, at 382–

383.)

　　　　Mr. Campbell was not involved in this investigation.  However, he said that

he received an oral "high level summary" of the results, "[e]ssentially that . . . they

didn't find a firearm, but reviewed the policy with Mr. Carico."  (Doc. # 42-2, at 72,

75 (Campbell Dep.).)

## J.　Second Complaint Against Mr. Carico for Allegedly Carrying a Firearm on UPS Freight Property and His Termination

　　　　On or about December 5, 2018, Ms. Curzi received a call from Jeff Waite, a

driver for UPS Freight at the Montgomery facility.  During the call, Mr. Waite told

her that Mr. Carico wore a firearm on his hip in a holster at the Montgomery facility

and that it was intimidating.  (Doc. # 42-3, at 61 (Curzi Dep.).)  Mr. Waite also sent

her photos that he had taken.  While the photos do not include head shots—capturing

only the torso to feet area—Mr. Waite represented that the photos depicted Mr.

Carico with a firearm on his hip at the Montgomery facility.  (Doc. # 41-4, ¶ 5 (Curzi Decl.) & Ex. A (photographs); Doc. # 42-3, at 50–52, 101–05.)  Mr. Waite identified Brady Cox as an additional witness.  (Doc. # 42-3, at 52.)

As part of her investigation, Ms. Curzi spoke by phone with Mr. Cox, a part-time supervisor at the Montgomery facility.  Mr. Cox told her that several times Mr. Carico had been at the facility with a firearm holstered on his hip.  Mr. Cox provided a signed statement.  (Doc. # 41-4, ¶ 6 (Curzi Decl.) & Ex. B (Cox's Signed Statement:  "Troy Carico has come to work with a gun on his side multiple times and a few employees have been concerned about it.").)  Ms. Curzi gave Mr. Cox's and Mr. Waite's statements to Shawana Kenner, a security manager.  (Doc. # 42-3, at 72–73 (Curzi Dep.); Doc. # 41-4, ¶ 5; Doc. # 41-5, ¶ 2 (Kenner Decl.); *see also* Doc. # 42-3, at 163–65 (Curzi's notes on her investigation).)  Ms. Curzi did not interview Mr. Carico about the accusation.  (Doc. # 42-3, at 84.)

As part of her investigative follow-up, Ms. Kenner communicated with Mr. Cox, Mr. Waite, and a third individual, Brittany Hanvey.  First, in a phone interview, she talked to Mr. Cox, who informed her that Mr. Carico "often wore a firearm on his hip in a holster when working at the Montgomery facility."  (Doc. # 41-5, ¶ 4 (Kenner Decl.).)

Second, Mr. Waite sent Ms. Kenner additional photographs, which he represented were of Mr. Carico with a firearm on his hip in the Montgomery facility.

Again, none of the photographs shows Mr. Carico's face.  She passed along the photographs to Rob Adams, a security supervisor for UPS Freight.  (Doc. # 41-5, ¶ 5.)

Third, Ms. Kenner conducted a phone interview with Ms. Hanvey, the freight account executive at the Montgomery facility.  Ms. Hanvey conveyed that several times she had witnessed Mr. Carico wear a firearm on his hip in the Montgomery facility, most recently within the previous week.  (Doc. # 41-5, ¶ 6 (Kenner Decl.).)  Ms. Hanvey also followed up with an email to Ms. Kenner, documenting the following.  She was confused why Mr. Carico carried a pistol since Defendant was a "no carry company"; Mr. Carico exuded a "very rigid military mentality" when speaking; she had been informed that Mr. Carico suffered from PTSD; and "knowing [Mr. Carico] had a pistol on him with PTSD, [she] didn't want to say anything that could set something off with all the recent shootings in the news."  (Doc. # 41-5, at 9 Ex. B (Hanvey's email).)

On December 7, 2018, Mr. Adams sent Duane Williams, the director of human resources, the photographs he had received from Ms. Kenner after her investigation of the allegations that Mr. Carico had a firearm on premises.  (Doc. # 41-2, ¶ 6 & Ex. C (photographs) (Williams Decl.).)  Mr. Williams also reviewed the statements from Mr. Cox and Ms. Hanvey.  (Doc. # 41-2, ¶ 7.)

23

Mr. Williams discussed these witness statements and photographs with Eric Mauro, vice president of security, and with Tamiko Moody, the employee relations manager.  Based on these photographs and witness statements, Mr. Mauro, Ms. Moody, and Mr. Williams concluded that Mr. Carico carried a firearm into the workplace in violation of Defendant's Workplace Violence Prevention Policy. (Doc. # 41-2, ¶ 8 (Williams Decl.).)

Although Mr. Campbell was not involved in the foregoing investigation, he knew that Defendant's security and HR teams were investigating allegations that Mr. Carico brought a firearm into the Montgomery facility.  (Doc. # 42-2, at 87 Campbell Dep.); Doc. # 41-2, ¶ 8 (Williams Decl.).)  On a conference call on December 12, 2018, Mr. Campbell was informed of the results of the investigation. On that call were Duane Williams, Mr. Mauro, Ms. Moody, and others (who are not identified).  (Doc. # 41-3, ¶ 9 (Campbell Decl.); Doc. # 42-2, at 87.)  Mr. Campbell was informed about Mr. Cox's and Ms. Hanvey's statements and the photographs. During that call, Mr. Williams recommended that Mr. Campbell terminate Mr. Carico's employment.  (Doc. # 41-2, ¶ 9.)  Mr. Campbell agreed based on the eyewitness statements and photographs, as well as the fact that Mr. Carico had been subject to a prior investigation based on a similar accusation in May 2018 and had been reminded of the no-weapons policy.  (Doc. # 41-3, ¶ 9.)  It is undisputed that,

as Mr. Carico's direct supervisor, Mr. Campbell had the final say on the termination decision.  (Doc. # 42-2, at 109–10.)

The next day, on December 13, 2018, along his driving route to work, Mr. Carico observed twelve police vehicles "staggered about every half a mile."  (Doc. # 42-1, at 431 (Pl. Dep.).)  When he arrived, "he was met at the facility by two armed Montgomery County Sheriff's officers with shotguns at port arms (*i.e.*, across their chests)."  (Doc. # 42-9, ¶ 96 (Pl. Decl.); Doc. # 42-1, at 431.)  Mr. Campbell also was standing there and uttered "something to the effect, 'I've got you now.'"  (Doc. # 42-1, at 434 (Pl. Dep.) (internal quotation marks added).)   Mr. Campbell pronounced, "You're no longer going to be in charge of this terminal."  Mr. Carico asked, "What are you firing me for?" to which Mr. Campbell retorted, "Because you carried a weapon on the property."  Mr. Carico said, "Whoa, whoa, whoa," and he denied that he had possessed a weapon on Defendant's premises.  Mr. Campbell dismissed the denial, stating, "[W]e've done our own investigation."  (Doc. # 42-1, at 434.)

Mr. Carico was then called into a meeting and was terminated "immediately" on grounds that he violated Defendant's Workplace Violence Prevention Policy. (Doc. # 41-3, ¶ 10 (Campbell Decl.); Doc. # 42-9, ¶ 99 (Pl. Decl.).)  Mr. Carico testified that he was "completely shocked."  (Doc. # 42-1, at 440 (Pl. Dep.).)  He "had no clue" that he had been accused of carrying a firearm on UPS Freight

property.  (Doc. # 42-1, at 440.)  He testified, "[N]o one called me to try to discuss it with me.  No one asked me anything.  They just fired me."  (Doc. # 42-1, at 440.)

## K.   Mr. Carico's Job Performance History

During his tenure at UPS Freight, Mr. Carico improved his terminal's ranking from 232 out of 239 to 61.  (Doc. # 42-9, ¶ 19 (Pl. Decl.).)  Also, his performance evaluations were positive overall (Doc. # 42-2, at 182–219), and Mr. Carico was not subject to any discipline until his firing.  (Doc. # 42-1, at 357–58.)

Furthermore, Mr. Carico never posed an imminent threat to the physical safety of Defendant's employees.  (*See, e.g.*, Doc. # 42-2, at 117 (Campbell Dep.) (confirming that he had not "witness[ed] anything in Troy's behavior in the two or more years that [he] supervised him, that indicated that he had a potential for violence"); *see also* Doc. # 42-3, at 154 (report on the investigation of Mr. Carico's alleged firearms possession, documenting that "workplace violence" was not "imminent or being threatened").)

## L.   A Separate Incident Involving a Managerial Employee's Possession of a Weapon on Defendant's Premises

In early January 2019, Ms. Curzi received a call from a driver who reported that he had heard that J.G.,[9] a manager of Hispanic origin who worked at Defendant's

---

[9] The individual will be referred to by his initials.

Miami terminal, carried a firearm and knife to work.  The driver, who declined to identify himself, confirmed that he had not witnessed J.G. carrying a knife or gun. (Doc. # 41-4, ¶ 7 (Curzi Decl.).)  Ms. Curzi discussed the complaint with Ms. Kenner, after which Mr. Adams investigated the allegations but was unable to substantiate them.  (Doc. # 41-4, ¶ 7; Doc. # 41-3, ¶ 11 (Campbell Decl.).)  Ms. Kenner directed Mr. Campbell to interview J.G. about the accusation.  (Doc. # 41-5, ¶ 7 (Kenner Decl.); Doc. # 41-3, ¶ 11.)

Mr. Campbell traveled to the Miami terminal and met with J.G., who denied that he had ever carried a firearm to work.  He admitted, though, that he brought a "two-inch paring knife" to work and told Mr. Campbell that he used the knife to cut up the fruit he brought for lunch.  J.G. showed Mr. Campbell the knife.  J.G. was not terminated.  Instead, Mr. Campbell instructed him not to bring it to work again (to which J.G. agreed) and reviewed with J.G. UPS Freight's Workplace Violence Prevention Policy.  (Doc. # 41-3, ¶ 12 (Campbell Decl.).)

## M.   Mr. Carico's Lawsuit

Mr. Carico commenced this suit on October 17, 2019, within ninety days of his having received a Dismissal and Notice of Rights from the Equal Employment Opportunity Commission as to his charge of discrimination against Defendant.  (*See* Doc. # 1-1.)  The Amended Complaint, which is the operative pleading, contains five counts:  (1) a claim alleging a racially discriminatory termination in violation of

Title VII (Count I); (2) an ADA disability discrimination claim premised on theories of disparate treatment and hostile work environment (Count II); (3) an ADA retaliation claim (Count III); (4) a military discrimination claim under USERRA (Count IV); and (5) state-law claims for breach of contract and for intentional infliction of emotional distress (brought together in Count V). (Doc. # 23 (Am. Compl.).) Mr. Carico seeks compensatory damages, lost wages and benefits, reinstatement, back pay, and interest, as well as punitive and liquidated damages. (Doc. # 23, at 16–17.)

## IV. DISCUSSION

Defendant has moved for summary judgment on all claims in the Amended Complaint. Mr. Carico has abandoned or conceded the state-law claims and one federal-law claim. These claims are mentioned first. The focus of the discussion is on Mr. Carico's remaining federal-law claims. At bottom, Mr. Carico argues that the real reason Defendant fired him was not because he violated Defendant's no-weapons policy, but rather "due to his status" as a disabled, white veteran and in retaliation for his having accused Mr. Campbell of harboring disability-based animus. (Doc. # 42, at 18.)

### A.  Conceded and Abandoned Claims

Three claims have fallen by the wayside along the way and require only a mention. First, Mr. Carico concedes his state-law claim for breach of contract, which

28

he incorrectly refers to as an "ERISA claim." He expressly "does not object to dismissal of that claim." (Doc. # 42, at 40.)

Second, Mr. Carico has abandoned two claims. Mr. Carico's summary judgment response does not address UPS Freight's well-reasoned grounds for summary judgment on his ADA discrimination claim alleging a hostile work environment and his state-law claim for intentional infliction of emotional distress. (Doc. # 41, at 22–26, 32–33.) "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). A plaintiff opposing summary judgment cannot rest on his pleadings, *see Celotex Corp.*, 477 U.S. at 324 (citation omitted), and "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned," *Resolution Trust Corp.*, 43 F.3d at 599. Accordingly, as to these claims, Defendant is entitled to summary judgment.

## B.  <u>Disparate Treatment Claims under Title VII and ADA</u>

Mr. Carico brings disparate treatment claims under Title VII and the ADA. Those claims require proof of discriminatory intent. Because Mr. Carico relies on circumstantial evidence, the analysis proceeds under the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See*

29

*Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc) (applying the *McDonnell Douglas/Burdine* framework to the plaintiff's claims of intentional discrimination under Title VII); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) (analyzing an ADA disparate treatment claim under the *McDonnell Douglas* paradigm).   Under this framework, the employee bears the initial burden of establishing a prima facie case of discrimination.   *McDonnell Douglas Corp.*, 411 U.S. at 802.   The burden of production then shifts to the employer to demonstrate a legitimate, non-discriminatory reason for the challenged employment action.   If the employer meets this burden, the employee must show that the employer's proffered reason is pretext for discrimination.   *See id.* at 804.

Defendant argues that Mr. Carico's Title VII and ADA claims alleging a discriminatory termination based on his race (Title VII) and disability (ADA) fail for two reasons.   First, it contends that Mr. Carico has not proved a prima facie case because he has failed to put forth a comparator who is "similarly situated in all material respects."   *Lewis*, 918 F.3d at 1218.   Second, Defendant argues that Mr. Carico has not raised a genuine dispute of material fact that Defendant's legitimate, non-discriminatory reason for terminating him is a pretext for race or disability discrimination.

For his part, Mr. Carico denies that he violated Defendant's weapons policy. He contends that he satisfies the prima facie case because "the overwhelming

evidence is that he never carried a firearm at work in violation of the Defendant's work rules." (Doc. # 42, at 18.) Mr. Carico further argues that Defendant conducted an inferior investigation into his alleged work-rule violation, which demonstrates that it "did not have a good faith honest but mistaken belief that [he] was carrying a weapon" at the workplace. (Doc. # 42, at 18–19.) Mr. Carico contends that pretext is the "primary issue" and that there are myriad reasons that deflate Defendant's purported justification for the work-rule violation. (Doc. # 42, at 24.)

Because there is overlap in the analysis of the prima facie cases and Defendant's proffered reason for firing Mr. Carico, the ADA and Title VII discrimination claims are discussed together for the first and second parts of the tripart *McDonnell Douglas* framework. The similarities diverge at the pretext stage and are addressed separately. The ADA claim survives summary judgment; the Title VII claim does not.

**1.     Mr. Carico has demonstrated a prima facie case of disability and race discrimination because he has identified a similarly situated comparator.**

To establish a prima facie case of discrimination under Title VII, the plaintiff generally must establish that (1) he is a member of a protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse employment action; and (4) his employer treated similarly situated employees more favorably. *See Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 842–43 (11th Cir. 2000). To

establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate that (1) he has a disability; (2) he is a "qualified individual"; and (3) the defendant unlawfully discriminated against him "because of his disability." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). A plaintiff can demonstrate the third element by showing that a similarly situated employee without a disability was treated more favorably than he or she was treated. *Godwin v. Mem'l Hosp. & Manor*, No. 1:15-CV-140 (LJA), 2018 WL 1528204, at *11 (M.D. Ga. Mar. 28, 2018); *see also Wolfe v. Postmaster Gen.*, 488 F. App'x 465, 468 (11th Cir. 2012) (Under the ADA, "[t]o establish unlawful disparate treatment, a plaintiff generally must demonstrate that his employer treated similarly situated employees outside of his protected class more favorably than he was treated." (citing *Burke–Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006)); *see generally Hill v. Branch Banking & Tr. Co.*, 264 F. Supp. 3d 1247, 1260 (N.D. Ala. 2017) (finding that plaintiff failed to show she was terminated "because of" her disability in part because her comparators were not "similarly situated").

Defendant challenges only Mr. Carico's ability to prove the last element of the Title VII and ADA prima facie cases.[10] Defendant points to J.G., a non-disabled

---

[10] For purposes of this opinion, it will be presumed that Mr. Carico can establish the other elements of the prima facie cases.

individual of Hispanic origin, arguing that he is not a similarly situated employee who received more favorable treatment than Mr. Carico.

Mr. Carico responds that he need not identify "another individual who was similarly charged and not terminated." (Doc. # 42, at 24.) He contends that "all other terminal managers" under Mr. Campbell's supervision are apt comparators "because none of them were *falsely* accused . . . based on such flimsy evidence." (Doc. # 42, at 24 (emphasis in original).) Alternatively, Mr. Carico contends that J.G. is a proper comparator. Each party's arguments have flaws. Ultimately, Mr. Carico prevails on the prima facie cases.

The Eleventh Circuit has explained that "no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 n.6 (11th Cir.), *opinion superseded in part on other grounds on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998). Rather, for cases involving alleged discrimination in the application of discipline for the violation of a work rule, a plaintiff must show that he "has engaged—either (a) disputedly or (b) admittedly— in misconduct similar to persons outside the protected class" whom the employer treated more favorably. *Id.*

Under *Jones*, even though Mr. Carico denies that he violated Defendant's rule prohibiting weapons on its property, he still must point to an employee outside his

33

protected class who allegedly engaged in similar misconduct but whom Defendant treated better.  Hence, Mr. Carico's benchmark—which encompasses every terminal manager under Mr. Campbell's supervision because none has been accused falsely of misconduct—is a nonstarter.  The critical issue in analyzing Mr. Carico's prima facie cases under both Title VII and the ADA is whether J.G., a non-disabled individual of Hispanic origin, is a similarly situated employee who received more favorable treatment than Mr. Carico.

For the reasons to follow, Defendant's definition of a proper comparator also misses the mark.  In *Lewis*, the Eleventh Circuit explained that whether the plaintiff and the proposed comparator are similarly situated in "all material respects" requires a case-by-case analysis:  "Ordinarily, for instance, a similarly situated comparator . . . (1) will have engaged in the same basic conduct (or misconduct) as the plaintiff," (2) "will have been subject to the same employment policy, guideline, or rule as the plaintiff," (3) "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff," and (4) "will share the plaintiff's employment or disciplinary history."  918 F.3d at 1227–28 (citations omitted).

It is undisputed that J.G. and Mr. Carico both had to adhere to the Workplace Violence Prevention Policy, which prohibited "the possession and/or use of weapons by any employee on UPS property" (Doc. # 41-1, at 101), and that they had the same supervisor, Mr. Campbell.  Notwithstanding those shared characteristics, Defendant

argues that J.G. and Mr. Carico are not similarly situated because Mr. Carico's termination followed a *second* complaint that he had a firearm on the premises. However, J.G. "ha[d] not been subject to" a second complaint of possessing a firearm on its premises, and, thus, according to Defendant, the two "did not engage in the same misconduct." (Doc. # 41, at 20.)

Defendant focuses on the similarity of its treatment during the investigation and resolution of the *first-time complaints* against J.G. and Mr. Carico whereby they were accused of possessing a *firearm* on its property. In both cases, security officials were unable to substantiate the complaints, and J.G. and Mr. Carico denied the accusations. With no proof that either had a firearm on UPS Freight property, Defendant did not find a violation of its policy prohibiting possession of a firearm, and, thus, Defendant contends that Mr. Carico and J.G. were treated the same. Defendant emphasizes that J.G. was not accused a second time of bringing a firearm on the premises but that Mr. Carico was. According to Defendant, the second accusation against Mr. Carico of a firearms violation distinguishes the conduct of Mr. Carico from that of J.G. This time Mr. Carico has the better argument.

Mr. Carico contends that Defendant's comparison is inapt because it focuses on the accusation, rather than on the offense. Mr. Carico urges a comparison of the incidents that, as a result of Defendant's investigation, revealed (at least in Defendant's mind) a first-time *offense* for a violation of its weapons policy. Those

35

two incidents arise from Defendant's investigation of J.G. in January 2019 for having a two-inch paring knife on its premises and of Mr. Carico in December 2018 for carrying a firearm on its premises.  More specifically, Mr. Carico's first *offense* occurred in December 2018, not in May 2018.  After its investigation of the May 2018 complaint against Mr. Carico—during which Mr. Carico denied that he had a firearm on premises and pointed out to the investigators that he had a cigar lighter that resembled a firearm—Defendant deemed the complaint unfounded.  J.G.'s first (and only) offense occurred in January 2019.  Based on Defendant's investigations, these incidents resulted in first-time *offenses* for J.G. and for Mr. Carico.

Viewing the facts in the light most favorable to Mr. Carico, the court finds that a comparison of the offenses, rather than of the accusations, is the better apples-to-apples comparison.  In January 2019, J.G. admitted to Mr. Campbell that he brought a two-inch paring knife to work.  Defendant has not denied that a knife qualifies as a weapon under its policy.  As to Mr. Carico, Defendant concluded after its investigation that he possessed a firearm on its property.  Hence, Defendant concluded that both J.G. and Mr. Carico had a weapon on its property in violation of the Workplace Violence Prevention Policy, and, significantly, this policy does not differentiate in the level of discipline depending on the type of weapon possessed. For these reasons, Mr. Carico has shown that he committed the "same basic conduct (or misconduct)" as J.G.  *Lewis*, 918 F.3d at 1227.

Furthermore, J.G. was treated more favorably than Mr. Carico in two ways. First, Mr. Carico received harsher discipline for possessing a weapon than that meted out to J.G. for possessing a weapon—Mr. Carico was fired based on his first offense for possessing on its premises what Defendant thought was a firearm.  J.G. was not terminated for his first offense but merely was instructed not to bring the knife to work and was reminded of UPS Freight's no-weapons policy.  Second, J.G. was allowed to give his side of the story, and, as a result, it can be inferred that his asserted, benign reason for having a knife at work was credited.  Mr. Carico, however, was not permitted to defend himself and present his side of the story.  And, according to Mr. Carico, he could have shown that his accusers mistook his cigar lighter for a firearm if he had been given the opportunity.  Mr. Carico satisfies the fourth element of his prima facie case.

## 2.   *Defendant has established a legitimate, non-discriminatory reason for Mr. Carico's termination.*

Defendant asserts that it terminated Mr. Carico for a legitimate, non-discriminatory reason.  Its investigation revealed that, in December 2018, Mr. Carico carried what it deemed to be a firearm on UPS Freight property in violation of its no-weapons policy.  Under the policy, this infraction is grounds for termination.  An employee's violation of Defendant's policy banning the possession of weapons at

the workplace presents a legitimate, non-discriminatory reason for firing that employee.

Arguing that Defendant has not met its burden of production, Mr. Carico focuses primarily on alleged deficiencies in the investigation.  (Doc. # 42, at 30–31.) These arguments are not sufficient to defeat Defendant's burden of *production*, but rather are appropriate for discussion at the pretext stage.

"An employer's burden to articulate a non-discriminatory reason" for the adverse employment action "is a burden of production, not of persuasion." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769–70 (11th Cir. 2005) (citation omitted). Thus, the employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.  Because the employer's "burden involves no credibility determination, it has been characterized as exceedingly light." *Vessels*, 408 F.3d at 769–70. The employer need only "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's [termination]." *Burdine*, 450 U.S. at 254; *see also id.* at 258 (explaining that "[l]imiting the defendant's evidentiary obligation to a burden of production will [not] unduly hinder the plaintiff" because "the defendant's explanation of its legitimate reasons must be clear and reasonably specific").  "Placing this burden of production on the defendant . . . serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual

issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255–56.

Defendant's evidence achieves *Burdine*'s twin goals. Defendant has submitted evidence, none of which Mr. Carico contends is inadmissible, that supports a legitimate, non-discriminatory reason for his termination. Defendant has submitted declarations from supervisory officials in human resources (Ms. Curzi, Ms. Kenner, and Mr. Williams) detailing the chronology of the December 2018 investigation into Mr. Waite's complaint that Mr. Carico carried a firearm on UPS Freight property. That investigation started with Mr. Waite's interview and with Ms. Curzi's review of the photographs Mr. Waite represented depicted Mr. Carico with a firearm holstered on his right hip. (Doc. # 41-4, ¶¶ 5–6 (Curzi's Decl.); Doc. # 42-3, at 61 (Curzi Dep.).) The investigation also included interviews with two additional employees who provided written statements that they had seen Mr. Carico wearing a firearm on a hip holster at work. (Doc. # 41-4, at 8 (Brady Cox Statement); Doc. # 41-5, at 9 (Brittney Hanvey Statement).) Total there were five photographs. (Doc. # 41-4, at 5 (photo that Mr. Carico admits depicts him at work, *see* Doc. # 42-1 at 395); Doc. # 41-4, at 6 (photo); Doc. # 41-2, at 23 (photo); Doc. # 41-2, at 24 (photo); Doc. # 41-2, at 25 (photo).)

After Ms. Curzi's and Ms. Kenner's review, Ms. Kenner gave Mr. Adams (a security supervisor) four of the photographs, witness statements, and details about

Mr. Waite's complaint against Mr. Carico.  (Doc. # 41-2, at 2 (Williams' Decl.).)
While some of the photographs are blurry and focus on the torso and legs (and do
not include a headshot), one photo in particular shows what a UPS Freight official
could have believed was a pistol on the right hip of a white male of similar size as
Mr. Carico.  (*Compare* Doc. # 41-2, at 23 (UPS 000550), *with* Doc. # 42-7, at 3.)
Mr. Williams then discussed the witness statements with the vice president of
security (Eric Mauro) and the human resources director (Ms. Moody).  These three
"concluded that Carico carried a firearm into the workplace and had violated UPS
Freight's Workplace Violence Prevention Policy." (Doc. # 41-2, at 2.)  Thereafter,
Mr. Campbell was briefed on the investigation into whether Mr. Carico had been
armed on the premises.  Mr. Williams recommended that Mr. Campbell terminate
Mr. Carico's employment immediately, and Mr. Campbell concurred.  (Doc. # 41-
3, at 3 (Campbell Decl.).)

Based on the foregoing evidence, Defendant has provided specific and
detailed evidence demonstrating how it reached its conclusion that Mr. Carico
violated its no-weapons policy.  Its reason, which relies on a work-rule violation, is
a legitimate, non-discriminatory reason for terminating Mr. Carico.  Defendant has
"framed the factual issue with sufficient clarity so that [Mr. Carico] will have a full
and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56.
Defendant has hurdled its burden of production.  The analysis thus turns to pretext.

**3.    Mr. Carico has presented evidence that his termination was pretext for disability discrimination but not that it was pretext for race discrimination.**

As detailed above, Defendant says that it fired Mr. Carico because, after an investigation based on three eyewitness statements and photographs, it substantiated the allegations that Mr. Carico was armed on UPS Freight premises in violation of its no-weapons policy.  Mr. Carico now must rebut Defendant's proffered legitimate, non-discriminatory reason for his termination.

"The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons." *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1333 (11th Cir. 1998).  A plaintiff may demonstrate pretext by revealing "'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions" in the employer's proffered reason for its adverse employment action "'that a reasonable factfinder could find [it] unworthy of credence.'" *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (quoting *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (alteration added)).  "However, a reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Id.* at 1349 (citation and internal quotation marks omitted).

Mr. Carico argues that Defendant's reason for his termination is pretext for disability and race discrimination for the following reasons:  (1) He did not violate the no-weapons policy; (2) the investigation into his alleged misconduct was "shoddy" because Mr. Carico was not interviewed or permitted to defend himself against the accusation and because Mr. Campbell did not conduct an independent investigation (Doc. # 42, at 30–31); (3) Mr. Campbell made a "snide comment" to Mr. Carico at the termination meeting "to the effect" that "I've got you now" (Doc. # 42-1, at 434 (Pl. Dep.); Doc. # 42, at 37); (4) Mr. Carico prevailed at his unemployment compensation hearing (Doc. # 42, at 33); (5) Mr. Campbell repeatedly questioned Mr. Carico's mental health status and disapproved of his taking time off for medical appointments (Doc. # 42, at 34–35); and (6) Defendant's investigation of his email complaint to Ms. Curzi on January 8, 2018, concerning Mr. Campbell's disability-based animus was handled with a "cavalier attitude" and in violation of its procedures (Doc. # 42, at 36; *see also* Doc. # 42, at 38).

Two preliminary findings about Mr. Carico's grounds will assist in tightening the proper focus on the pretext inquiry.  First, grounds (5)–(6) are related only to Mr. Carico's disability discrimination claim.   They do not speak to alleged discrimination based on race.

Second, Mr. Carico's reliance on the decision from his unemployment compensation hearing in January 2019 is misplaced.  Mr. Carico says that, after a

42

telephonic hearing, the hearing officer credited his testimony, which included discussion of his replica firearm that is a cigar lighter, and ruled in his favor.[11]  (Doc. # 42-9 ¶¶ 106–07 (Pl. Decl.).)

The fact that Mr. Carico persuaded the hearing officer that he did not engage in the charged misconduct of possession of a firearm on UPS Freight's property does not answer the question under federal law of whether Defendant's asserted reason for terminating Mr. Carico is a cover up for discrimination.  Mr. Carico cites no authority to support his contention, and other courts have rejected analogous arguments.  *See Fiedler v. Starwood Hotels & Resorts Worldwide, Inc.*, No. 05-61671-CIV, 2007 WL 9700855, at *10 (S.D. Fla. June 12, 2007) (agency's finding that the plaintiff's actions did not amount to "misconduct" for purposes of unemployment compensation benefits was insufficient to prove pretext because "[t]he issues relevant to the Agency's determination of [the plaintiff's] unemployment compensation claim are not identical—not even close—to the issues relevant to a determination of whether [the employer] retaliated against [the plaintiff]"); *see also Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 247 (1st Cir. 2006) (holding that the Maine Department of Labor's administrative decision, which found that the employer had not proved that the plaintiff's conduct rendered him ineligible

---

[11] The hearing officer's decision is not part of the summary judgment record.

for unemployment benefits, was immaterial on the question of pretext; among other things, that decision "did not address or find that [the employer] had no reasonable basis to believe that [the plaintiff] had engaged in misconduct"); *Rudy v. Walter Coke, Inc.*, 21 F. Supp. 3d 1228, 1249 (N.D. Ala. 2014) ("While the determination that the plaintiff is entitled to unemployment benefits necessarily included a determination that he did not engage in 'misconduct' that precludes recovery under Alabama State law, it is not a determination that precludes this court [under principles of *res judicata*] from considering the defendant's purported legitimate business reasons for terminating the plaintiff."), *aff'd*, 613 F. App'x 828 (11th Cir. 2015); *Chestang v. AAA Auto Club S.*, No. 1:06-CV-0999-AJB, 2007 WL 1450399, at *15 (N.D. Ga. May 14, 2007) (rejecting the plaintiff's contention "that the Georgia Department of Labor ('DOL') decision awarding him unemployment compensation benefits demonstrates that the employer's reason for his termination is false" because "a determination by [the DOL] regarding entitlement to unemployment benefits is not binding on this Court, nor preclusive to the issues presented by Defendant's motion for summary judgment").

### (a)     Pretext and the ADA

To begin, Mr. Carico has presented evidence to refute the accusation that he had a firearm at work. He has testified that he has a cigar lighter that is a "very lifelike replica of a Walther PPK," that the lighter has a holster, and that at work he

44

sometimes holstered the lighter on his hip.  (Doc. # 42-1, at 383–84 (Pl. Dep.).)  Mr. Carico has submitted photographs of the cigar lighter, which confirm the lighter's resemblance to a firearm (Doc. # 42-7), and he has offered evidence from three UPS Freight drivers who knew at the time that he sometimes carried a pistol-shaped lighter on his person at work.  (*See* Doc. # 42-8, ¶ 6 (Godwin Decl.); Doc. # 42-6, at 14–16 (Solomon Williams Dep.); Doc. # 42-5, at 22 (Harris Dep.).)

Even if Mr. Carico's evidence, accepted as true, demonstrates that he did not carry a firearm on his employer's premises—or that Defendant mistakenly confused the lighter for a firearm—that evidence by itself cannot create a genuine dispute of material fact on the issue of pretext.  "Where an employee argues that he did not actually engage in misconduct," as here, "an employer may rebut this allegation by showing its good faith, honest belief that the employee violated a rule."  *Stone & Webster Constr., Inc. v. U.S. Dep't of Labor*, 684 F.3d 1127, 1136 (11th Cir. 2012); *Vessels*, 408 F.3d at 771.  Focusing on the facts underlying an employer's asserted belief helps to ensure that the court does not become a "super-personnel department'" because "it is not [the court's] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive."  *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)); *see also Dawson v. Henry Cty.*

*Police Dep't*, 238 F. App'x 545, 549 (11th Cir. 2007) ("The pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue.").

Based on the foregoing authority, Mr. Carico's evidence that he did not violate Defendant's no-weapons policy, standing alone, does not prove pretext. His evidence must impugn the truthfulness of Defendant's assertion that it believed that Mr. Carico had a firearm on its premises.

Mr. Carico has presented evidence, considered cumulatively and in the light most favorable to him, that raises a genuine dispute of material fact as to whether his termination was pretext for disability discrimination. This evidence includes biased comments made by Mr. Campbell, who had the final say in Mr. Carico's termination, divergences from standard practices, and the evidence establishing the prima facie case.

First, a supervisor's biased remark, even where isolated and not directly related to the employment decision, "can contribute to a circumstantial case of pretext." *Rojas v. Fla.*, 285 F.3d 1339, 1343 (11th Cir. 2002). Mr. Carico has submitted evidence that his direct supervisor, Mr. Campbell, harbored disability-based hostility against him based on his frequent absences for medical appointments

for his service-connected disabilities.  Mr. Campbell's alleged remarks include the following:

- Words to the effect that Mr. Carico's "VA appointments were getting in the way of developing his people and managing his payroll hours effectively" and that his medical conditions "were preventing him from fulfilling his duties" (Doc. # 42-9, ¶¶ 39–40 (Pl. Decl.) (describing Mr. Campbell's voicemail to him); Doc. # 42-1, at 209–11, 213–14 (Pl. Dep.));

- His question to Mr. Carico, "What is wrong with you?," which he uttered during a conversation that "included talk of [Mr. Carico's] need to take time off for medical issues" (Doc. # 42-1, at 190, 193–97 (Pl. Dep.); Doc. # 41-9, ¶ 50 (Pl. Decl.));

- His question to Mr. Carico, "Are you going to be on the call tomorrow, or are you going to have something to do with your VA appointments?" (Doc. # 42-1, at 178 (Pl. Dep.) (providing an example of one of Mr. Campbell's questions that Mr. Carico deemed "inflammatory"); *see also* Doc. # 42-1, at 229–30 (testifying that he took offense to Mr. Campbell's questions along the lines of "[A]re you going to be on the call tomorrow, or do you have something to do with your psychiatry thing at the VA?"));

- Mr. Campbell's "multiple text messages" to Mr. Carico that began with a "question about [his] availability" due to his "VA appointments" (Doc. # 42-1, at 228–29 (Pl. Dep.));

- Questions to Patrick Harris, a driver who worked under Mr. Carico's supervision, including "[W]hy does [Mr. Carico] take so much time off?" and "What is wrong with him?" (Doc. # 42-5, at 18, 36–37 (Harris Dep.));

- Questions to Clifford Godwin, another driver under Mr. Carico's supervision, including "[W]hy is Troy always out for VA Appointments or services?"; "Don't you think he is gone too much to be an effective leader and manager?"; and "What exactly is his problem and mental state of disarray that requires him to be attending so m[any] medical appointments?" (Doc. # 42-8, ¶ 5 (Godwin Decl.));

- An inquiry to Mr. Carico's brother, who also worked for Defendant, "What's wrong with your brother?" (Doc. # 42-4, at 15 (Chad Carico Dep.).)

A reasonable jury could derive from Mr. Campbell's alleged derogatory statements and questions that he held animus toward Mr. Carico based upon his service-connected disabilities and that he was frustrated with Mr. Carico's recurring medical appointments and frequent absences from work.  Against the backdrop of

the Eleventh Circuit's decision factoring a supervisor's isolated biased remarks into the pretext analysis, *see Rojas*, 285 F.3d at 1343, Mr. Carico's evidence presents a circumstantial case for pretext.  Mr. Campbell's alleged derogatory remarks were not isolated; they bordered on persistent and increased in frequency after the December 2017 incident.  Connecting the inferential dots, a reasonable jury could conclude that the build-up of Mr. Campbell's open rancor toward Mr. Carico's recurring medical appointments and absences culminated in his "I-got-you-now" statement that immediately preceded Mr. Carico's termination.

Moreover, Mr. Campbell's comments are probative because he undisputedly made the ultimate decision to fire Mr. Carico.  *Cf. Jones v. Gerwens*, 874 F.2d 1534, 1542 n.13 (11th Cir. 1989) ("Disparate treatment analysis requires that none of the participants in the decision-making process be influenced by racial bias.").  Mr. Campbell's motivations "are pertinent."  *Id.*; *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 356 (6th Cir. 1998) ("[W]hen assessing the relevancy of an allegedly biased remark where the plaintiff presents evidence of multiple discriminatory remarks or other evidence of pretext, we do not view each discriminatory remark in isolation, but are mindful that the remarks buttress one another as well as any other pretextual evidence supporting an inference of discriminatory animus.").  The evidence raises a genuine dispute of material fact as to Mr. Campbell's true motivation for his decision to fire Mr. Carico.

Second, "an employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) (citation omitted). Here, there is evidence that Defendant's investigations into employee misconduct typically included discussions with the accused party. For example, Ms. Curzi and Ms. Brown actively communicated with Mr. Campbell both times when Mr. Carico accused him of disability-based harassment. Interviewing the accused also is consistent with Ms. Curzi's testimony that her department strived to obtain as many "specifics" as possible so that a "thorough investigation" could take place. (Doc. # 42-3, at 20–21, 112 (Curzi Dep.).) Yet, during Defendant's two-week investigation, no member of the investigative team contacted Mr. Carico.

Relatedly, a reasonable jury could infer that, in failing to interview Mr. Carico after he was accused the second time of carrying a pistol on the premises, Defendant turned a blind eye to crucial information it had garnered during its first investigation of the same complaint against Mr. Carico. According to Mr. Carico's evidence, which is the evidence that matters at summary judgment, Defendant was on notice, as early as May 2018, that Mr. Carico had a cigar lighter that looked like a pistol. That is because during the first investigation, Mr. Carico showed Defendant's security officials the incriminating cigar lighter. (Doc. # 42-1, at 319, 374.) Notwithstanding that knowledge, Defendant's investigating officials did not probe

50

whether the cigar lighter again was the culprit.  Instead, Defendant faults Mr. Carico

for not mentioning the cigar lighter on the day of his termination.  (Doc. # 41-3, ¶ 10

(Campbell Decl.).)  First, crediting Mr. Carico's undisputed testimony that he had

no knowledge an investigation was even being conducted, and was shocked to be

fired, gives lie to any inference that he knew the offending article was in fact a

weapon, not a lighter that resembled one, or that he intentionally did not possess it

at work that day.  Moreover, the evidence supports a reasonable inference that, on

December 13, 2018, it would not have mattered what Mr. Carico said in his defense.

Mr. Campbell's mind was already made up to fire Mr. Carico, and armed law

enforcement officials stood ready if needed to assist in executing the termination.

With all factual inferences drawn in Mr. Carico's favor, Defendant's failure to confer

with Mr. Carico concerning the accusation against him contributes to the inference

of discrimination.

There also is evidence that Defendant's human resources employees breached

standard protocols in investigating Mr. Carico's pre-termination complaints that Mr.

Campbell displayed hostility toward his recurring medical appointments and that the

harassment exacerbated his PTSD symptoms.  Mr. Carico has presented evidence

that neither Ms. Curzi nor Ms. Brown followed up with him after his initial

complaint against Mr. Campbell in May 2017 (Doc. # 42-1, at 341–42, 347–48 (Pl.

Dep.); Doc. # 42-3, at 34 (Curzi Dep.)); that she did not obtain a written statement

after he complained in May 2017 and again in January 2018 that Mr. Campbell was exhibiting disability-based animus toward his recurring medical appointments (Doc. # 41-9, ¶¶ 55–56 (Pl. Decl.); Doc. # 42-3, at 112–13); and that no one in the human resources department provided him with a packet that he could use to file for a workplace accommodation.  (Doc. # 42-3, at 15–16 (Curzi Dep.); Doc. # 41-9, ¶ 57.) Ms. Curzi also admits that she has no documentation, and no independent recollection, of having conducted any investigation into Mr. Carico's January 2018 complaint that Mr. Campbell's disability animus had continued unabated.  (Doc. # 42-3, at 40–41.)  And Mr. Carico confirms that he was not included in any of the discussions between human resources employees and Mr. Campbell concerning his complaints:  "Q.  You weren't present for any discussions between HR and Danny, were you?  A.  Negative.  I was never even asked."  (Doc. # 42-1, at 352.)  A reasonable jury could conclude further that, when Mr. Campbell became involved in the discussions with Ms. Curzi and Ms. Brown about Mr. Carico's complaints against him, including that Mr. Campbell was exacerbating his PTSD, the lines of communication between human resources and Mr. Carico went silent.  (Doc. # 42-1, at 342, 347 (Pl. Dep.).)

These aberrations from Defendant's normal procedures in addressing both complaints made by and against Mr. Carico are consequential in the collective

consideration of whether Mr. Carico has raised a genuine dispute of material fact on the issue of pretext.

Third and finally, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ("[T]he fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination."). That is the case here. The totality of the circumstances shows weaknesses and implausibilities in Defendant's reasoning that is probative of pretext and raises a genuine dispute of material fact as to whether Defendant unlawfully terminated Mr. Carico based on his disability. These circumstances include the final decisionmaker's open malevolence toward Mr. Carico's medical appointments for his service-connected disabilities, deviations from Defendant's typical investigative procedures, Mr. Carico's history as a successful manager with no violent propensities or prior discipline, Defendant's prior knowledge that Mr. Carico had a cigar lighter that replicated a pistol, and the elements of the prima facie case.

Defendant makes several salient points in support of its motion.  For instance, it emphasizes that Mr. Campbell never prevented Mr. Carico from attending his medical appointments, did not discipline Mr. Carico for attending any medical appointments, and in an email encouraged Mr. Carico to take care of his health. (Doc. # 43, at 11.)  These facts lend support to the arguments Defendant can make to a jury, but they do not negate an inference of discriminatory motive on summary judgment.

In sum, Mr. Carico's evidence is sufficient to create a genuine dispute of material fact whether Defendant intentionally discriminated against Mr. Carico based on his disabilities.  Consequently, Defendant's motion for summary judgment on Mr. Carico's ADA disability-discrimination claim is due to be denied.

### (b)    Pretext and Title VII

As to his Title VII race discrimination claim, Mr. Carico offers only conclusory statements that his termination was driven by race because his supervisor, Mr. Campbell, is African American, and because Mr. Campbell has "admitted that this is not the first race discrimination filed against him." (Doc. # 42, at 24; *see also* Doc. # 42-2, at 134 (Campbell Dep.) (testifying about a prior "unsubstantiated" charge brought by a white employee against him for race discrimination).)  These facts do not make a Title VII race discrimination claim.

The summary judgment record reveals no evidence from which a reasonable jury could find that Defendant terminated Mr. Carico because of the color of his skin (white).  *See Turner v. Fla. Prepaid Coll. Bd.*, 522 F. App'x 829, 833 (11th Cir. 2013) ("Unless something links the actions to the employee's race, that a decisionmaker singles an employee out does not permit a jury to infer intentional discrimination based on race.").  Defendant's motion for summary judgment on Mr. Carico's Title VII race discrimination claim is due to be granted.

## B.   ADA Retaliation

The parties' summary judgment arguments focus on the ADA's anti-retaliation provision that "prohibits retaliation against an individual for opposing an unlawful practice . . . ."  *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing 42 U.S.C. § 12203(a)); *see also* 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter . . . .").

The analysis of ADA retaliation claims tracks the framework used for retaliation claims arising under Title VII.  *See Parker v. Econ. Opportunity for Savannah–Chatham Cty. Area, Inc.*, 587 F. App'x 631, 633 (11th Cir. 2014) ("[W]e assess ADA retaliation claims under the same framework employed for retaliation claims arising under Title VII." (citing *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1287 (11th Cir. 1997)).  Because Mr. Carico relies on circumstantial

55

evidence to prove his claim of retaliation under the ADA, the *McDonnell Douglas* burden-shifting framework applies.  The analysis begins and ends with the prima facie case.

To establish a prima facie case of retaliation under the ADA, Mr. Carico "must demonstrate (1) that []he engaged in statutorily protected conduct, (2) that []he suffered an adverse employment action, and (3) that a causal connection exists between the two." *Batson v. Salvation Army*, 897 F.3d 1320, 1329 (11th Cir. 2018). The first and third elements are contested.  Concerning the second element, to quote Mr. Carico's brief, "obviously, [he] suffered an adverse employment action, *i.e.*, his termination."  (Doc. # 42, at 38.)

Focusing on Mr. Carico's January 8, 2018 email to Ms. Curzi, Defendant argues that Mr. Carico has not shown that he "engage[d] in ADA protected activity" because he "did not raise any concerns under the ADA."  (Doc. # 41, at 27.) Alternatively, Defendant asserts that, even if this email is "considered ADA-protected conduct," his termination eleven months later is too temporally remote to establish causation.  (Doc. # 41, at 28.)

On the other hand, Mr. Carico argues that he "engaged in numerous acts of statutorily protected expression," with the "[m]ost notable [being] his email in January of 2018 to Ms. Curzi."  (Doc. # 42, at 37.)  He categorizes his January 8, 2018 email to Ms. Curzi as the vessel for his complaint against Mr. Campbell's

continued disability-based harassment.   As for temporal proximity, Mr. Carico argues that he "objected repeatedly" to Mr. Campbell's disability-based hostility toward him, not just on January 8, 2018, but that Mr. Campbell's harassment continued unabated.  (Doc. # 42, at 37–38.)

Because both parties concentrate on Mr. Carico's January 8, 2018 email to Ms. Curzi as the protected conduct, the email's pertinent text is set out here.  The subject of the email is: "Follow up regarding my disability status and VA appointments with Danny Campbell."  (Doc. # 42-3, at 146 (Jan. 8, 2018 email).)  In the body of the email, Mr. Carico includes the following:  (1) "I have not heard anything from Kimara [r]egarding my situation with Danny . . . ."  (2) "I trust that Danny will be educated on how to properly discuss matters with me regarding my medical disabilities" and my "protected status." (3) "I would appreciate if Danny will let us operate and take care of business without continued harassment regarding my medical conditions . . . ." (4) "[F]urther his communication approaches exacerbate my PTSD and he needs to be aware of this per my Psychiatric team . . . ." (Doc. # 42-3, at 146.)

A plaintiff satisfies the first element of the ADA prima facie case where he makes "a request for a reasonable accommodation," *Frazier-White*, 818 F.3d at 1258, and has an "objectively reasonable belief" that the ADA entitles him to the

accommodation he requested, *Standard*, 161 F.3d at 1328.  Under this definition, Mr. Carico hurdles this element.

Putting the best facts forward, a reasonable jury could conclude that, in his January 8, 2018 email, Mr. Carico was requesting an accommodation for his PTSD and other ADA disabilities.  Defendant advances no argument that Mr. Carico did not objectively and reasonably believe that the accommodation he requested— training for Mr. Campbell on communicating with ADA-disabled employees—was a valid accommodation request under the ADA.  (*See, e.g.*, Doc. # 42-9, ¶¶ 61, 62 (Pl. Decl.) (espousing his belief that "a warranted reasonable accommodation is a modification in the communication from Mr. Campbell," including training for Mr. Campbell "on effective communication strategies with people with PTSD").)  Nor does Defendant cite any authority that would support a contrary conclusion. Accordingly, it will be presumed that Mr. Carico satisfies the first element of his ADA prima facie case.

The prima facie case, however, fails on the third element.  In *Higdon v. Jackson*, 393 F.3d 1211 (11th Cir. 2004), the Eleventh Circuit succinctly set out the standard for gauging causation for the prima face case on an ADA retaliation claim:

> A plaintiff satisfies this element if he provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action.  A "close temporal proximity" between the protected expression and an adverse action is sufficient circumstantial evidence of a causal

connection for purposes of a prima facie case. We have held that a period as much as one month between the protected expression and the adverse action is not too protracted.

> The Supreme Court has stated that "mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citations omitted). The Court cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection. *See id.* (citing *Richmond v. ONEOK*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174–75 (7th Cir. 1992) (4-month period insufficient)). If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.

*Id.* at 1220 (cleaned up).

Based upon the principles espoused in *Higdon*, the time that passed between January 8, 2018, and Mr. Carico's termination on December 13, 2018—a week shy of eleven months—is too attenuated to permit "a reasonable inference of a causal relation between the protected expression and the adverse action." *Id.* at 1221.

Mr. Carico argues that the proper measurement for temporal proximity is the time that elapsed between "the September 2018 incident" and his termination. (Doc. # 42, at 38.) This argument fails to demonstrate the requisite causal link. Mr. Carico has not elaborated on the sort of incident that occurred in September 2018, and he has not cited the portions of the record that describe a September 2018 incident. An independent review of the summary judgment record has failed to uncover the

origins of a disability-based complaint that Mr. Carico made during that time frame. "It is the obligation of the non-moving party, however, not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment." *Lawrence v. Wal–Mart Stores, Inc.*, 236 F. Supp. 2d 1314, 1322 (M.D. Fla. 2002); (*see also* Doc. # 32 § 2 (Am. Uniform Scheduling Order) (providing that "the discussion of the evidence in the brief must be accompanied by a specific reference, by page and line, to where the evidence can be found in a supporting deposition or document" and that "[f]ailure to make such specific reference may result in the evidence not being considered by the court").)  Even if it is assumed that Mr. Carico engaged in statutorily protected expression in September 2018, it remains speculative as to whether the gap in time between that expression and his termination still is too protracted.  *See Higdon*, 393 F.3d at 1220–21 (holding that, by itself, three months would not be sufficient to establish causation).

Mr. Carico argues also that he engaged "in numerous acts of statutorily protected expression" (Doc. # 42, at 37), but he does not identify those acts, specify their timeframe, or provide citations to the record to where the evidence can be found.  His conclusory mention of numerous other acts does not help close the temporal gap.

Finally, notwithstanding his arguments to the contrary, Mr. Carico does not provide any evidence other than temporal proximity to demonstrate causation for

purposes of his prima facie case.  He seems to argue "that the time between the protected activity and the adverse employment action is equal to the time between any action taken as a result of the employee's protected activity and the adverse employment action."  *Scalone v. Home Depot U.S.A., Inc.*, 280 F. App'x 905, 909 n.2 (11th Cir. 2008); (*see* Doc. # 42, at 37–38 (arguing that Mr. Campbell's criticisms continued beyond January 2018).)  Like the plaintiff in *Scalone*, who unsuccessfully made this argument, Mr. Carico "does not elaborate . . . or provide legal support for this contention."  280 F. App'x at 909.

Mr. Carico has not raised a genuine dispute of material fact that a causal connection exists between his request for an ADA accommodation on January 8, 2018, and his termination on December 13, 2018.   Because he fails to establish a prima facie case of retaliation under the ADA, Defendant's motion for summary judgment is due to be granted on this claim.

## C.   <u>USERRA Discrimination</u>

Mr. Carico also alleges that Defendant discriminated against him under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4311.  The USERRA provides, as pertinent here:

> (a) *A person who* is a member of, applies to be a member of, performs, *has performed*, applies to perform, or has an obligation to perform *service in a uniformed service shall not be denied* initial employment, reemployment, *retention in employment*, promotion, or any benefit of employment by an employer *on the basis of that* membership,

application for membership, *performance of service*, application for service, or obligation.

. . .

(c) An employer shall be considered to have engaged in actions prohibited—

(1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service . . . .

§ 4311(a), (c) (emphasis added).

Mr. Carico contends that he seeks protection from discrimination under USERRA "due to his status as a disabled *veteran*."  (Doc. # 42, at 39 (emphasis in original).)  Arguing that "[t]here is an inextricable link between [his] military service and his disability," Mr. Carico's premise is that, because his medical appointments at the Veterans Affairs hospital "were caused by his service as a veteran," USERRA's requirements apply to him.  (Doc. # 42, at 39.)

Defendant contends that Mr. Carico's theory relies upon the erroneous assumption that USERRA covers discrimination based on his medical appointments for his service-connected disabilities.  Defendant asserts additionally that Mr. Carico has not offered any evidence of military animus, pointing out that Mr. Carico was recruited to work at UPS Freight based on his veteran status.  (Doc. # 43, at 16.)

The authority and evidence support Defendant's view.  In *Moore v. Epperson Underwriting Co.*, the district court rejected the USERRA plaintiff's argument that "his absences to treat his service-related medical conditions qualified as military service and therefore [his employer] violated USERRA when it allegedly terminated him because of those absences."  No. 06-2563 ADM/AJB, 2007 WL 4811412, at *9 (D. Minn. Aug. 15, 2007).   The court concluded that "the sole inquiry under USERRA's definition of 'service' is whether Moore's medical absences constituted performance of a military duty under competent authority.   Whether Moore's medical condition is service-related is irrelevant under the statute."  *Id.* (citing 38 U.S.C. § 4303(11), which defines the term "service in the uniformed services" under USERRA).

USERRA defines "service in the uniformed services" as "the performance of duty on a voluntary or involuntary basis in a uniformed service under competent authority" and includes, among other things, "active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty" and "a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty. . . ."  § 4303(11).  There is no evidence that Mr. Carico, as an Army veteran, was obtaining medical services in connection with active or inactive duty; his military service ended more than six years prior to his hiring at UPS Freight.  Nor is

there any evidence, or even argument, that his medical appointments were for "the purpose of an examination to determine the fitness of the person to perform any such duty." § 4303(11). As in *Moore*, Mr. Carico's medical appointments do not qualify as "the performance of duty in a uniformed service." § 4303(11).

Additionally, courts consistently have concluded that claims similar to the one Mr. Carico advances must be brought under the ADA's provisions prohibiting intentional discrimination and fall outside USERRA's coverage. Dismissing an USERRA claim as deficient as a matter of law, the court in *Kieffer v. Planet Fitness of Adrian, LLC*, No. 17-CV-11307, 2017 WL 3581315 (E.D. Mich. Aug. 18, 2017), reasoned:

> Plaintiff must allege that his protected status as a veteran was a substantial or motivating factor in his termination. Instead, he has alleged that his taking time off of work to attend medical appointments related to his disability was the substantial or motivating factor in his termination, which is an ADA claim. He then attempts to convert this claim into one under USERRA because his disability is associated with his military service. His military service ended over eight years before the events at issue in his complaint. He cites no other action, statement, or policy of the employer that could lead to a plausible inference of discriminatory intent.

*Id.* at *4; *see also Holmes v. Dep't of Justice*, 498 F. App'x 993, 995 (Fed. Cir. 2013) (affirming the Merit Systems Protection Board's decision dismissing the plaintiff's USERRA claim: "A PTSD injury alone is not enough to raise a cognizable discrimination claim under USERRA. As the administrative judge correctly

explained, '[T]he fact that an appellant's injury occurred during his military service does not transform his allegation into a USERRA claim.'"); *Ferrell v. Ezpawn Okla., Inc.*, No. CIV-18-607-SLP, 2019 WL 3207797, at *3 (W.D. Okla. July 16, 2019) ("Plaintiff has not alleged that Defendant took an adverse employment action based on his military service; rather, he alleges that he was discriminated against due to the disability he suffered during his military service.  Such alleged discrimination is not within the scope of USERRA's protections."); *Carroll v. Delaware River Port Auth.*, 89 F. Supp. 3d 628, 633 (D.N.J. 2015) ("A USERRA plaintiff has the initial burden of demonstrating that his military *service*, as distinct from a *disability* resulting from service, was a substantial or motivating factor in the employer's [challenged] decision" (collecting cases decided by the Merit Systems Protection Board)); *see also* Kathryn Piscitelli and Edward Still, *Persons protected from discrimination*, The USERRA Manual § 7:1 ("The fact that a veteran has a military-related disability would not by itself protect the veteran from adverse employment actions under § 4311." (collecting cases)).

Mr. Carico suffered greatly as a result of his service to this country in the United States Army.  Having survived an explosive blast, burn pit exposure, and other awful conditions, he lives with bilateral hearing loss, tinnitus, degenerative bone disease, skin conditions, and PTSD.  (Doc. # 42-1, at 38–39 (Pl. Dep.).)  He has submitted evidence that these service-connected disabilities required his taking

time off work for frequent medical appointments and that his medical appointments were the source of the discriminatory animus underlying his termination. Based on the evidence, Mr. Carico has raised a genuine dispute of material fact as to whether his termination arose from Mr. Campbell's alleged animus toward his frequent absences for medical appointments and the drain that he believed Mr. Carico's appointments placed on the company, and not from animus toward Mr. Carico's prior service in the United States Army.[12]   The evidence supports an ADA discrimination claim, but not an USERRA claim. As discussed in Part IV.B., his discriminatory termination claim is cognizable under the ADA and survives summary judgment.

Under the foregoing persuasive authority, Mr. Carico's argument that he has a USERRA claim because his VA medical appointments "were caused by his service as a veteran" must fail.   (Doc. # 42, at 39.)  His USERRA claim is a veneer for an ADA disability discrimination claim. Mr. Carico cannot transform his ADA claim into one under USERRA solely "because his disability is associated with his military service." *Kieffer*, 2017 WL 3581315, at *4.

---

[12] The most that Mr. Carico has offered is that, unfortunately, Mr. Campbell never recognized or thanked him for his military service, including on Veteran's Day. (Doc. # 42-1, at 199 (Pl. Dep.).) Mr. Carico, however, cites no authority that would treat Mr. Campbell's silence as open hostility toward military veterans.

USERRA does not protect Mr. Carico from adverse employment actions on the basis that he, as a military veteran, has service-connected disabilities that require medical treatment. Mr. Carico's evidence falls measurably short of showcasing a genuine dispute of material fact for trial on this claim. Accordingly, Defendant is entitled to summary judgment on Mr. Carico's USERRA claim.

## D. A Final Word About Damages and Equitable Relief

Defendant argues that, should one of Mr. Carico's federal-law claims survive summary judgment, any award of back pay "must be cut off as of December 13, 2019." (Doc. # 41, at 33.) According to Mr. Carico's testimony, the Department of Veterans Affairs rendered a decision that Mr. Carico was "permanent[ly] and totally disabled." (Doc. # 42-1, at 36–37, 51–52 (Pl. Dep.); Doc. # 41, at 33.) Thereafter, he was awarded unemployment benefits retroactive to December 13, 2019. (Doc. # 41, at 33.) Alternatively, Defendant asserts that "back pay should be cut off as of December 16, 2020, when, during Plaintiff's deposition in this case, Plaintiff admitted that he lied on his employment application, in clear violation of UPS Freight's Honesty in Employment Policy."[13] (Doc. # 41, at 33 n.6 (citing Pl. Dep.).)

---

[13] According to Defendant, it learned about the false representations in Mr. Carico's application after the commencement of this lawsuit. For obvious reasons, Defendant has not argued that this policy violation motivated its decision to terminate Mr. Carico's employment. *See Campbell v. Civil Air Patrol*, 138 F. App'x 201, 203 (11th Cir. 2005) (An employer's after-the-fact justification for taking an adverse employment action is evidence of pretext.); *see also Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) ("[A] method of establishing pretext is to show that [the employer]'s nondiscriminatory reasons were after-the-

Defendant also contends that Mr. Carico cannot recover front pay and is ineligible for reinstatement.  (Doc. # 41, at 33.)

Notwithstanding Mr. Carico's failure to address these arguments, summary judgment on the question of the recoverability of damages and equitable relief will be denied at this juncture, but without prejudice.  Ruling is reserved, and briefing on these specific issues will be ordered at a later date.

## V.  CONCLUSION

Mr. Carico has presented sufficient evidence, drawn in the light most favorable to him, to permit a reasonable jury to conclude that Defendant's proffered reason for terminating him is pretext for disability discrimination in violation of the ADA.  More specifically, a reasonable jury could infer that Mr. Campbell, the final firing authority, terminated Mr. Carico based upon his service-related disabilities and the number of medical appointments he had for treatment for his disabilities.  Therefore, summary judgment for Defendant on this ADA discrimination claim is not appropriate.  All other claims fail.

Accordingly, it is ORDERED that Defendant's motion for summary judgment (Doc. # 40) is GRANTED in part and DENIED in part as follows:

---

fact justifications, provided subsequent to the beginning of legal action.").

(1)     DENIED as to Mr. Carico's claim alleging intentional discrimination under the ADA based on a disparate-treatment theory;

(2)     GRANTED as to Mr. Carico's claim alleging intentional race discrimination under Title VII based on a disparate-treatment theory;

(3)     GRANTED as to Mr. Carico's claim alleging intentional discrimination under the ADA based on a hostile work environment theory;

(4)     GRANTED as to Mr. Carico's state-law claim for intentional infliction of emotional distress;

(5)     GRANTED as to Mr. Carico's state-law claim for breach of contract; and

(6)     GRANTED as a matter of law as to Mr. Carico's USERRA claim.

It is further ORDERED that Defendant's motion for summary judgment on the recoverability of damages and equitable relief is DENIED without prejudice at this time.

DONE this 21st day of June, 2021.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE